UNITED STATES DISTRICT COURT           FOR PUBLICATION

EASTERN DISTRICT OF NEW YORK

RICHARD BECKHAM

                Petitioner,

– against –

CHRISTOPHER MILLER           **MEMORANDUM & ORDER**

                Respondent.           18-CV-3571 (ERK)

KORMAN, *J.*:

Upon surfacing from a subway station after 4 a.m. one morning, a woman was followed by an unknown male, who forced her into a stairwell and attempted to sexually penetrate her. The victim called the police and underwent a medical evaluation. DNA evidence collected during her medical evaluation was found to match Richard Beckham's buccal swab. A jury convicted Beckham of attempted predatory sexual assault. This federal habeas petition follows.

## BACKGROUND

The 26-year-old victim testified that, on May 20, 2009, she left a friend's birthday celebration in Brooklyn and rode the subway to her stop in Queens. Trial Tr., Victim Test., ECF No. 12-3 ("Victim Test."), at 449-52. As she exited the station at 63rd Drive around 4 a.m., an unknown man began speaking to her and followed her as she walked towards home. *Id.* at 453. The man then sped up, grabbed her from behind, put his hand over her mouth to prevent her from screaming, and dragged her into a stairwell. *Id.* at 453-54, 472. He announced his intention to "make love to [her]" and demanded that she lie on the ground. *Id.* at 454-55, 458, 460, 480.

1

Shocked, disgusted, and not "on top of [her] game" after drinking beer that night, the victim did not resist. *Id.* at 455, 459-60, 472, 479-80. The man proceeded to pull down her pants and attempt penetration. *Id.* at 454-56. Unable to maintain an erection, the man eventually gave up and walked back in the direction of Queens Boulevard. *Id.* at 456-57.

The victim, walking in the opposite direction, dialed 911 and reported the attack. *Id.* at 457, 467, 485. Police and an EMT reported to the crime scene. *Id.* at 485-87. The victim was then transported to the hospital via ambulance. *Id.* at 458, 486. An emergency room physician examined the victim and collected a buccal swab, vaginal swab, and anal swab as part of a rape kit. *Id.* at 459; Trial Tr., Newstead Test., ECF No. 12-4, at 665-70.

On June 19, 2009, law enforcement received an investigatory lead on the offender's identity, resulting in Beckham becoming a suspect and his subsequent arrest in connection with this sexual assault. Trial Tr., Aquaviva Test., ECF No. 12-3, at 566-67. Sixteen months following Beckham's arraignment, the prosecution was granted permission to obtain a buccal swab from Beckham for the purpose of comparing it to the DNA profiles generated from the victim's underwear and pantyliner stains on the night of the attack. Opp'n Pet. Writ Habeas Corpus, ECF No. 11, at 28-29. Kerry Annitto, a forensic biologist and Level 3 criminalist employed by the Office of Chief Medical Examiner's ("OCME"), analyzed the DNA evidence and reported a match. Trial Tr., Annitto Test., ECF No. 12-4 ("Annitto Test."), at 592, 607.

At trial, the prosecution presented the following evidence: a surveillance videotape showing the victim walking next to a man around 4:30 a.m. and then walking off screen before any physical contact occurred, photographs of the stairwell where the victim was led, the victim's 911 call, the OCME criminalist's testimony regarding the DNA match between the samples collected and Beckham's buccal swab, and the victim's testimony regarding the assault.

Beckham's defense consisted of two main theories: First, the victim and defendant engaged in consensual sexual acts, and only after their encounter, did she regret her actions and lie to the police about an attack. *See, e.g.*, Def.'s Summation, ECF No. 12-4, at 708-709, 716-17, 718. Second, if the defendant did attack the victim, no penetration occurred whatsoever, meaning that a key element of predatory sexual assault could not be established. *Id.* at 721, 726.

While the OCME forensic biologist, Kerry Annitto, did not perform the DNA testing herself, she personally interpreted the results and reported her findings, which showed that semen discovered from the vaginal swab, as well as the victim's underwear and pantyliner matched only one male DNA profile: Richard Beckham's. Annitto Test. 606-09, 610-615. Annitto testified that that profile could only be found in "one in greater than a trillion people." *Id.* at 602.

The jury acquitted Beckham of predatory sexual assault (count 1) and convicted him of *attempted* predatory sexual assault (count 2). Trial Tr., ECF No. 12-4, at 788-89; *see* N.Y. Penal Law § 130.95(3). He was sentenced to twelve-and-one-half years to life in prison. Sentencing Tr., ECF 12-4, at 19. The judgment was affirmed by the Appellate Division, Second Department. *See People v. Beckham*, 142 A.D.3d 556 (N.Y. App. Div. 2016).

Beckham is currently incarcerated and seeks habeas relief on three grounds: First, his constitutional rights to a fair trial, to present a defense, and to confrontation were violated when the court (1) denied his discovery request for the raw electronic data used in the DNA testing, (2) granted the prosecution's untimely motion for buccal swab testing, and (3) permitted a criminalist who did not personally test the evidence to testify about the incriminating results. Second, the prosecutor's mid-testimony conference with the victim, as well as portions of the opening and closing arguments, were improper. Third, Beckham was wrongly denied the circumstantial evidence charge he requested with respect to the DNA evidence.

# DISCUSSION

## I. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act allows a federal court to grant habeas relief to a prisoner convicted under state law when the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States" must involve a holding, rather than dicta, that gives a "clear answer to the question presented." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam). In determining what constitutes an "unreasonable application of[] clearly established Federal law," a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 405 (2000). In other words, a state prisoner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is a "highly deferential standard," requiring that state courts "be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). However, "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington*, 562 U.S. at 102.

## II. *The DNA-Related Claims*

### A. The raw electronic data

Beckham claims that he is entitled to habeas relief, because his discovery request for the raw electronic data generated during DNA testing pursuant to New York Criminal Procedure

4

Law Section 240.40(1)(c) was denied. The Appellate Division rejected this argument because the data at issue was "not in the possession or control of the People." *Beckham*, 142 A.D.3d at 556. Such a ruling—on a question of discovery governed by a New York statute—is a matter of state law. Critically, the Supreme Court holds, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Indeed, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973).

Beckham attempts to reframe this argument by claiming that non-disclosure violated his constitutional rights to confrontation, to present a defense, and to a fair trial. But Beckham rejected the State's offer to test the DNA evidence himself in order to gather his own raw electronic data and present DNA evidence as part of his defense. Nor did Beckham attempt to subpoena the data from OCME. Moreover, Beckham extensively cross-examined the OCME criminalist testifying about the DNA evidence at trial. *See* Annitto Test. 609-644. Beckham disputes none of this. Thus, he alleges no discernible constitutional violation upon which habeas relief could be granted.

### B. <u>The untimely buccal swab testing</u>

Beckham also argues that he is entitled to habeas relief because the State compelled him to provide a buccal swab more than forty-five days after arraignment in violation of New York Criminal Procedure Law § 240.90(1). Here, the state court properly exercised its discretion in granting the State's motion despite being untimely. *Beckham*, 142 A.D.3d at 556. I deny this claim for the same reasons that I deny Beckham's claim regarding the discovery of the raw

electronic data: Overturning a state court's decision on a matter of state law is improper on habeas review. *See Estelle*, 502 U.S. at 67-68.

      C.  Annitto's testimony

Beckham argues that he was denied his Sixth Amendment right to confrontation when criminalist Kerry Annitto was permitted to testify, since she did not personally perform the underlying DNA testing. Pet. Writ Habeas Corpus, ECF No. 1, at 4; *see Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) "([A]dmission of testimonial statements of a witness who did not appear at trial [is prohibited] unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."). The Appellate Division rejected Beckham's claim on the merits because Annitto "performed her own analysis of the DNA profiles, concluded that there was a DNA match, and issued the final report, which was challenged on cross-examination." *Beckham*, 142 A.D.3d at 556. The Appellate Division's ruling was not contrary to, or an unreasonable application of the clearly established law set out by the Supreme Court in the line of cases following *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) (holding that laboratory analysis reports created in anticipation of criminal prosecution, and the analysts' sworn affidavits attesting to the results therein, were testimonial and within the scope of the Confrontation Clause).

After *Melendez-Diaz,* the Supreme Court held that "surrogate testimony"—the testimony of a "qualified analyst" familiar with the laboratory's procedures but not a participant in or observer of the actual blood testing at issue—violates the defendant's right to confront his accusers. *Bullcoming v. New Mexico*, 564 U.S. 647, 652, 657, 661-62 (2011). Critically, the testifying analyst in *Bullcoming* had no "independent opinion" on the test result. *Id.* at 662. Justice Sotomayor's concurrence pointed out that the Supreme Court had not yet addressed "what degree of involvement is sufficient" to allow someone other than the analyst conducting the test to testify

and emphasized the difference between *Bullcoming*'s testifying analyst who "had no involvement whatsoever in the relevant test and report" and a hypothetical "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 672-73 (Sotomayor, J., concurring). The Supreme Court has still not answered the question of whether the testimony of such an individual satisfies the Confrontation Clause. *Cf. Gauldin v. Cate*, 672 F. App'x 774, 775 (9th Cir. 2017) (denying habeas relief on the ground that the opportunity to cross-examine a supervising criminalist, whose testimony was informed by the analyst's report, satisfied the Confrontation Clause).

Annitto's testimony is unlike the facts in *Bullcoming* and more similar to the hypothetical scenario Justice Sotomayor refers to in her concurrence. Annitto concedes that she did not perform every step of the testing process at issue; rather, many different employees dealt with the DNA samples and played a role in their testing. *See* Annitto Test. 610-615. But as one who "supervise[s] weekly rotations and the lower level criminalists on their daily tasks," *id.* at 593, and who "personally compared [Beckham's buccal swab] to the profile . . . that was developed from the underwear stain . . ., the pantyliner stain[s] . . . and the vaginal swabs fraction" in order to interpret the data, *id.* at 606, Annitto had a much more significant connection to the testing than that of the "surrogate" analyst testifying in *Bullcoming*. *See Bullcoming*, 564 U.S. at 559-60. Moreover, Annitto possessed an "independent opinion" regarding the data results. *See id.* at 662. By having the opportunity to cross-examine the criminalist who performed the final step of linking Beckham's DNA to the crime scene DNA evidence—the only accusatory step of the entire testing process and the step most helpful to criminal prosecution—Beckham's right to confrontation was satisfied. *See Bullcoming*, 564 U.S. at 664 (explaining that evidence generated to incriminate defendant in police investigation is testimonial and implicates the Confrontation Clause).

7

Particularly apposite is *Washington v. Griffin*, 876 F.3d 395 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2578 (2018). There, Washington argued on habeas review that the admission of an OCME case file on the DNA testing of his buccal swab during an analyst's testimony, absent the opportunity to cross examine every "non-testifying OCME analyst[] who conducted DNA testing of [his] buccal swab," violated the Confrontation Clause. *Id.* at 403. Here, Beckham's trial lawyer similarly stressed the many stages of the testing process in which Annitto did not participate and was not present. *See, e.g.*, Annitto Test. 611, 625, 626. In rejecting Washington's claim, however, the Second Circuit observed that "the Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another."[1] *Washington*, 876 F.3d at 407. And "[a] state court cannot be faulted for declining to apply a specific legal rule 'that has not been squarely established by [the Supreme] Court.'" *Id.* (quoting *Harrington*, 562 U.S. at 101 (2011)). The same is true here. Moreover, the Supreme Court has not squarely addressed the sufficiency of an analyst's testimony under the specific circumstances here—where the analyst compared and interpreted the DNA profiles but did not conduct the underlying tests.

For these reasons, I reach the same conclusion as the *Washington* Court: Beckham "has [not] sustained his burden of showing that the Appellate Division applied a rule contradict[ing] the governing law set forth in [the Supreme Court's cases]" or that its decision was "so lacking in

---

[1] Courts throughout the nation are continuing to explore the scope of the Confrontation Clause and resolve some of the many questions that the Supreme Court has not yet answered. *See, e.g.*, *State v. Norton*, 443 Md. 517, 117 A.3d 1055, 1058 (2015); *Commonwealth v. Yohe*, 621 Pa. 527, 79 A.3d 520 (2013). Although not binding here, the New York Court of Appeals recently confronted the question of whether a defendant was entitled to cross examine each analyst playing a role in a scientific testing process. *People v. John*, 27 N.Y.3d 294, 315 (2016). The Court of Appeals rejected an "all analysts" rule and held that the analysists involved in the "preliminary testing stages" of "extraction, quantitation or amplification" were not necessary witnesses under the Confrontation Clause. *Id.* Rather, the testimony of the "analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data" was sufficient. *Id.*

8

justification as to constitute an unreasonable application of clearly established federal law 'beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 410 (internal quotation marks omitted).

### III. The Prosecutor's Opening and Closing Arguments and Mid-Testimony Conference with the Victim

To secure relief from conviction based on prosecutorial misconduct, a defendant must show that the misconduct resulted in "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (internal quotation marks omitted). This analysis depends on "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)). Only in the "rare case" will a prosecutor's summation remarks, "even if objectionable," be deemed so prejudicial so as to warrant habeas relief since "the Government has broad latitude in the inferences it may reasonably suggest to the jury during summation." *Aquart*, 912 F.3d at 27 (quoting *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005)).

The Appellate Division held that Beckham's claims surrounding the prosecutor's opening and closing remarks were "for the most part, unpreserved for appellate review." *Beckham*, 142 A.D.3d at 556. Nevertheless, the Appellate Division reached the merits of the claim, concluding that "the prosecutor's remarks were either within the bounds of permissible rhetorical comment, responsive to the defendant's summation, or did not constitute reversible error." *Id.* Upon examination of the prosecutor's opening argument and summation, I conclude that Beckham's claim in this regard is unpreserved and procedurally forfeited. *See Quartarao v. Mantello*, 715 F. Supp. 449, 464 (E.D.N.Y. 1989), *aff'd*, 888 F.2d 126 (2d Cir. 1989) ("[I]f the issue was

9

inadequately preserved by timely objection or if petitioner failed to raise the issue on appeal he would also be precluded from raising it in a motion to vacate the judgment of conviction. The failure to timely object would be deemed to constitute a procedural forfeiture of the right to assert the issue."). I also agree with the Appellate Division that the claim is without merit and does not constitute an unreasonable application of clearly established federal law.

Beckham also argues that the trial court erred in refusing to strike the victim's testimony because of a conversation she had with the prosecutor about the authentication of the 911 call during a break in her testimony. This claim is without merit. While unauthorized conferences between prosecutors and witnesses are certainly disfavored, *see People v. McConville*, 49 N.Y.S.3d 244, 249-51, there is no constitutional law prohibiting such an action. *See United States v. Bautista*, 23 F.3d 726, 731-32 (2d Cir. 1994) ("While the [prosecutor's conference with the witness during adjournment of testimony at the pretrial evidentiary hearing] may well have been improper, it did not rise to the level of a constitutional violation."). Moreover, the series of events at issue was innocuous. After the victim made known her desire not to hear her 911 call in front of the jury—explaining that it would "bring [her] back to that night too vividly," Victim Test. 466—the prosecutor met with the victim in his office during lunch to play the 911 recording for her in private and allow her to initial the tape, *id.* at 467. The prosecutor then informed the trial judge on the record, but out of the presence of the jury, "At lunch, I used what was pre-marked as People's Exhibit 2 and asked [the victim] to listen to hear her voice on that call in order to clarify what took place . . . and avoid the need for her to listen with headphones to the 911 call in front of this jury which she obviously did not want to do this morning." Trial Tr. 475. When defense counsel objected on due process grounds to this conversation not occurring in the courtroom, the trial judge asserted that "all that should be placed on the record in front of

the jury [is] that [the victim] listened to it at lunchtime and recognized her voice." *Id.* Defense counsel was then given the opportunity to cross the victim about the mid-testimony conference and the 911 call. Victim Test. 484-85. The victim clarified that during her meeting with the prosecutor at lunch, she listened to the 911 recording and did not talk about anything else. *Id.* at 484.

## IV.     *The Circumstantial Evidence Charge*

Beckham also argues that all of the evidence in the case was circumstantial and that the jury should have been instructed as follows: "[I]t must appear that the inference of guilt is the only one that can be fairly and reasonably drawn from the facts and that the evidence excludes beyond a reasonable doubt every reasonable hypotheses [sic] of innocence." Brief for Respondent at 57, *Beckham*, 142 A.D.3d 556 (No. 12-00292) (adopted by Beckham in his petition for a writ of habeas corpus). While the Appellate Division did not specifically address and provide a rationale for rejecting Beckham's claim that he was entitled to a circumstantial evidence charge, the Appellate Division stated that the "remaining contentions . . . are without merit." *Beckham*, 142 A.D.3d at 556. This is sufficient to constitute a decision "on the merits in State court proceedings" under Section 2254(d), which is entitled to deference. *See Cavazos v. Smith*, 565 U.S. 2, 7, 9 (2011) (per curiam). Regardless, even on a direct appeal from a conviction, the Supreme Court rejected the circumstantial evidence charge that the petitioner requested on the ground that such an instruction is "confusing and incorrect." *Holland v. United States*, 348 U.S. 121, 139-40 (1954).

## CONCLUSION

Beckham's petition for a writ of habeas corpus is denied. I deny a certificate of appealability.

                                                      **SO ORDERED.**

                                            *Edward R. Korman*

Brooklyn, New York                                       Edward R. Korman
February 7, 2019                                           United States District Judge